# EXHIBIT 5

## Endorsement Agreement

This Endorsement Agreement (this "**Agreement**") is effective as of March 1, 2024 (the "**Effective Date**"), by and between RICH FRONING FITNESS, LLC, a Tennessee limited liability company ("**Mayhem**"); and FEAST BOX, LLC d/b/a Just Meats ("**Just Meats**"), a Utah limited liability company (each a "**Party**" and collectively, the "**Parties**")

WHEREAS, Rich Froning, Jr. ("**Froning**") is a globally recognized CrossFit athlete, celebrity, and the principal of Mayhem;

WHEREAS, Mayhem is the business vehicle for Froning and is globally recognized for its CrossFit athlete affiliates, customized training plans and platform, branded goods, special events, social media followings, and philanthropic activities;

WHEREAS, Just Meats is engaged in the development, manufacture, distribution and sale of precooked premium packaged meats;

WHEREAS, Just Meats' precooked packaged meat products are of potential interest to consumers familiar with Mayhem and/or Froning; and

WHEREAS, the Parties wish to engage in a business relationship whereby Mayhem, Froning, or Hillary Froning will provide certain express endorsements of Just Meats for the purpose of driving consumer sales of the Just Meat products, in exchange for the Compensation (as set forth in **Schedule 1.1**).

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Promotion and Limitations**.

1.1  Deliverables and Compensation.  Subject to the terms and conditions of this Agreement, Mayhem shall provide to Just Meats certain promotional services, Posts, digital media content, and other forms of Creative Content, related to Froning, Mayhem, and the promotion of the Just Meats products (the "**Deliverables**") in accordance with the timelines and in exchange for the compensation ("**Compensation**") set forth in Schedule 1.1 attached hereto.  As a portion of the Compensation, Mayhem shall be entitled to receive a bonus based on the sale of Just Meats products as more specifically set forth in Schedule 1.1 (the "**Sales Bonus**").  In relation to the Sales Bonus, the Parties shall provide a mutually agreeable and reasonable mechanism or method to track the sales of Just Meats products, and each Party shall provide the other Party with reasonable access to records related therewith.  Unless otherwise expressly stated to the contrary in Schedule 1.1, the Party entitled to receive a Sales Bonus shall receive such Sales Bonus on the last day of the month immediately following the month in which such sale was effective.  To the extent a Sales Bonus is due after the Term, the "Term" shall be extended to cover the payment earned during the Term.  Any amendment to the Deliverables or the items set forth in Schedule 1.1, as opposed to the Agreement, may be made during the Term of this Agreement by the mutual consent and written amendment to Schedule 1.1, provided, however, that such amendment may not adjust the Compensation to be paid by Just Meats to Mayhem.

1.2  FTC Compliance.  In performance of this Agreement, each Party hereby acknowledges and agrees that such performance and the provision of Deliverables may require the publication of social media posts on specific social media platforms as set forth and identified in Schedule 1.1 (the "Posts"). The Parties hereby acknowledge and agree that any such Post must comply with the Federal Trade Commission's Guides Concerning Endorsements and Testimonials ("**Endorsement Guides**").  Among other things, the Endorsement Guides and applicable law requires a Posting-Party to clearly and

conspicuously disclose a "material connection" with the non-Posting Party, making it clear that the Posting Party is a compensated endorser of the non-Posting-Party. To the extent applicable, a Posting-Party must place the disclosure in plain sight in close proximity to any audio or visual communications made about the non-Posting Party or such non-Posting Party's brands, products, goods, services, or other offerings. The Parties may not bury the disclosure in a link or place the disclosure in a string of hashtags or other disclosures. Any Post should only make factual statements about the non-Posting Party and such Party's products, goods, services, or other offerings, which the Posting Party believes are true. Each Party's Posts will be original and created solely by such Party unless otherwise agreed upon by the Parties. The Parties further acknowledge and agree that no Post will include the Covered Intellectual Property of third-parties, including any third-party music, photographs, artwork, trademarks, logos, or slogans, unless such the Posting-Party has the right to use such third-party material. The Parties may monitor each other's Posts for compliance with this Agreement and its respective obligations to third-parties, and each Party retains the right to address noncompliant Posts by taking any of the following actions: (i) requiring the non-compliant Posting Party to alter a Post, or (ii) terminating this Agreement to the extent a non-compliant Posting Party fails to correct a non-compliant Post within seven (7) days after receiving written notice of such non-compliance. For the avoidance of doubt, the term "**Posting-Party**" means the Party exerting ownership and control over the account publishing the Post.

      1.3   <u>Evaluation of Products and Services</u>. Mayhem will conduct such evaluation and use as it believes reasonably necessary to be satisfied that the Just Meats Products are suitable for Mayhem's use and recommendation. Just Meats will provide Mayhem, at no charge to Mayhem, with a reasonable quantity and variety of Just Meats products for Mayhem's use so that Mayhem has the opportunity to meet its obligations under this Agreement, including without limitation, <u>Section 1.2</u>.

## 2.   <u>Term and Termination</u>.

      2.1   This Agreement commences as of the Effective Date and, unless earlier terminated pursuant <u>Sections 1.3, 2.2, 2.3, or 2.4</u>, will continue for three (3) years from such date, (the "**Term**"). To the extent that a Deliverable is agreed upon and substantially performed prior to the expiration of the Term but is not due to be performed or published until after such Term, this Agreement may be extended to cover such Deliverable. By way of example and for the avoidance of doubt, if the Parties have agreed not to extend this Agreement beyond the Term, but have agreed to collaborate to record Creative Content (as defined below) to be included in a specific Post as a Deliverable, and such Deliverable is to be distributed after the expiration of the Term, this Agreement shall be extended for the limited purpose of covering the distribution and performance of such Deliverable without any further requirement to provide notice of termination or non-renewal of this Agreement.

      2.2   Either Party may terminate this Agreement, effective upon written notice to the other Party (the "**Defaulting Party**") if the Defaulting Party:

          (a)   Materially breaches this Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the Defaulting Party does not cure such breach within fifteen (15) days after receipt of written notice of such breach; or

          (b)   (i) becomes insolvent or admits its inability to pay its debts generally as they become due, (ii) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) days or is not dismissed or vacated within forty-five (45) days after filing, (iii) is dissolved or liquidated or takes any corporate action for such purpose, (iv) makes a general assignment for the benefit of creditors, or (v) has a receiver,

trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

2.3   Just Meats shall have the right to terminate this Agreement upon ten (10) days' prior written notice to Mayhem in the event that Mayhem or its principal commits any of the following: (i) engages in illegal, immoral, or criminal conduct resulting in a felony conviction; (ii) misrepresents or conceals anything in his background that could be detrimental to the value of the endorsement being made; (iii) engages in conduct that reasonably offends the sensitivities of a significant portion of the population, as determined in good faith; or, (iv) engages in conduct that could bring Just Meats into public disrepute.

2.4   Mayhem shall have the right to terminate this Agreement upon thirty (30) days' prior written notice to Just Meats if: (i) Just Meats substantially changes its manufacturing and/or sourcing practices such that the company's product in the view of an objectively reasonable person significantly deteriorates in quality or taste; or, (ii) Just Meats experiences a change in control.

2.5   Notwithstanding the foregoing, either Party, in its sole discretion, may terminate this Agreement at any time beginning one year after the Effective Date, without cause, by providing at least sixty (60) days' prior written notice to the other Party during the Initial Term and thereafter with thirty (30) days' prior written notice during any Renewal Term. In the event that Just Meats terminates under this Section, it shall be excused of the obligation to pay a Licensing Fee but shall remain obligated to pay any Revenue Share through the end of the Term.

3.   **Intellectual Property**.

3.1   For any creative content featuring or produced or provided by Mayhem pursuant to this Agreement, including but not limited to Deliverables, Posts, verbal scripts, video performances, audio and video recordings, graphics, pictures, or other forms of multimedia content (the "**Creative Content**") including any names, likenesses, works of authorship, whether or not copyrightable, trademarks or service marks, branding, patents, or any other information or material protectable or eligible for protection by applicable intellectual property law (the "**Covered Intellectual Property**") of or by Mayhem or Froning (the "**Mayhem IP**"), and in exchange for the compensation paid by Just Meats set forth in Schedule 1.1 of this Agreement, Mayhem, and to the extent applicable Froning individually, grant Just Meats a non-exclusive, non-transferrable, global, limited license to use such Creative Content, including the Covered Intellectual Property of Mayhem IP, in relation to the production, distribution, marketing, advertising, promotion, and sale of Just Meats products, including but not limited to, the use of the foregoing in all digital, social, online and point of sale materials (the "**Commercial Purposes**") during the term set forth on Schedule 1.1 (the "**License Term**"). Notwithstanding the Commercial Purposes and the license related therewith, Mayhem shall otherwise retain all right, title, and interest in and to the Creative Content and the Mayhem IP.  To the extent the Parties collaborate to produce Creative Content and other items which include the Covered Intellectual Property of the Parties, then each such Party shall retain its right, title, and interest in its respective Covered Intellectual Property contained within the collaboration; provided, however, to the extent an item of intellectual property cannot be reasonably attributed to a single Party (the "**Collaborative Intellectual Property**"), then the Parties shall jointly own such Collaborative Intellectual Property, and the right to use, register and/or commercially exploit the Collaborative Intellectual Property shall be governed by a separate  written agreement, subject to any limitations related to the portion of such Covered Intellectual Property of a specific Party (e.g., limits on the use of Covered Intellectual Property such as an applicable License Term).  By way of example, if the Parties jointly create and produce video content featuring Froning and the Just Meats products as a Deliverable, then the Parties will jointly own the video and any and all rights to use, register or commercially exploit the video, provided, however, that Mayhem and Froning shall own the rights related

3

to Froning's likeness (and any Mayhem trademarks) contained in the joint work, Just Meats shall own the rights related to its trademarks or service marks, branding and patents contained in the joint work, and the use of the Parties' respective Covered Intellectual Property in such video shall be subject to cross licenses to the other Party during such License Term.

3.2 Notwithstanding anything to the contrary in this Agreement Just Meats grants Mayhem a perpetual, royalty-free, non-exclusive, non-transferrable, global, limited license to use Just Meats' Covered Intellectual Property to be included in any Post, Deliverable, or otherwise delivered or used in relation to Mayhem's performance of its obligations under this Agreement (e.g., Mayhem's recorded use of the Just Meats products or any other items bearing Just Meats' logo).

3.3 Each Party represents, warrants, and covenants to the other Party, that its Covered Intellectual Property and Creative Content, do not and will not, infringe or otherwise violate any right of any third party, including any copyright, trademark, trade secret, or other intellectual property right, or any right of publicity or privacy.

3.4 Each Party shall keep the other Party apprised of any and all uses of the other Party's Covered Intellectual Property. In the event that a Party believes that the other Party has engaged and a non-permissible or non-consensual use of such Party's Covered Intellectual Property, the Party alleging such violation shall provide prompt notice to the other Party and the Party so using the Covered Intellectual Property shall immediately cease such use while the Parties work together in good faith to resolve the dispute.

4. **Confidentiality**.

4.1 "**Confidential Information**" means any oral or written information disclosed to either Party or known by either Party as a consequence of or pursuant to this Agreement, which is not generally known in the industry in which either Party is or may become engaged, about its business, products, processes, and services including research, development, designs, computer programs, products under development, manufacturing, purchasing, accounting, engineering, marketing, selling, customer lists, customer requirements, and the documentation thereof. It will be presumed that information supplied to either Party for the purpose of performing the duties and obligations pursuant to this Agreement is Confidential Information unless and until it is designated otherwise.

4.2 Confidential Information shall not include information that at the time of disclosure: (i) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this 4 by the receiving party or any of its affiliates, employees, officers, directors, partners, shareholders, agents, attorneys, third-party advisors, successors, and permitted assigns (collectively "**Representatives**"); (ii) is or becomes available to the receiving party on a non-confidential basis from a third-party source, provided that such third-party is not and was not prohibited from disclosing such Confidential Information; (iii) was known by or in the possession of the receiving party or its Representatives before being disclosed by or on behalf of the disclosing Party; or (iv) was or is independently developed by the receiving party without reference to or use, in whole or in part, of any of the disclosing party's Confidential Information.

4.3 The receiving Party shall: (i) protect and safeguard the confidentiality of the disclosing party's Confidential Information with at least the same degree of care as the receiving party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (ii) not use the disclosing party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and (iii) not disclose any such Confidential Information to any person or entity, except to the receiving Party's

4

Representatives who need to know the Confidential Information to assist the receiving party, or act on its behalf, to exercise its rights or perform its obligations under the Agreement and who has an affirmative obligation with the receiving party to safeguard and protect the Confidential Information to the same degree of care as the receiving Party.

4.4 The receiving Party shall be responsible for any breach of this <u>4</u> caused by the receiving Party or any of its Representatives. At any time during or after the term of this Agreement, at the disclosing Party's written request, the receiving party shall promptly return, and shall require its Representatives to return to the disclosing party all copies, whether in written, electronic or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed, as requested by the disclosing Party. In addition to all other remedies available at law, the disclosing party may seek equitable relief (including injunctive relief) against the receiving Party and its Representatives to prevent the breach or threatened breach of this <u>4</u> and to secure its enforcement.

5. **Public Announcements**. Neither Party (or their respective representative or affiliates) shall (orally or in writing) publicly disclose, issue any press release, or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement, without the prior written approval of the other Party (which shall not be unreasonably withheld, conditioned, or delayed), except if and to the extent that such Party (based on the reasonable advice of counsel) is required to make any public disclosure or filing regarding the subject matter of this Agreement (i) by applicable law, (ii) pursuant to any rules or regulations of any securities exchange of which the securities of such Party are listed or traded, or (iii) in connection with enforcing its rights under this Agreement (each (i) through (iii), a "**Required Disclosure**"). In each case pursuant to clauses (i) or (ii) of this <u>5</u>, the Party making any the disclosure shall consult with the other Party regarding the substance of the disclosure and provide the other Party a reasonable opportunity to review and comment on the content of the Required Disclosure prior to its publication or filing. Notwithstanding anything to the contrary and for the avoidance of doubt, this <u>Section 5</u> is intended to cover a Party's disclosure of the terms and provisions of this Agreement and is not intended to cover the various promotions of a Party or its products or services as established on <u>Schedule 1.1</u>.

6. **Non-Disparagement**. Each Party hereby agrees not, at any time make, publish, or communicate to any person or entity or in any public forum any disparaging remarks, comments, or statements concerning the other Party or any of their Representatives now or in the future. For the avoidance of doubt, nothing contained in this Section shall be construed to prohibit any Party from making any statement to the extent required by applicable law.

7. **Indemnification and Limitation on Liability**.

7.1 Each Party (as "**Indemnifying Party**") shall indemnify and hold harmless the other Party and its Representatives (collectively, "**Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including professional fees and reasonable attorneys' fees, that are awarded against Indemnified Party in a final judgment, administrative proceeding, or any alternative dispute resolution proceeding (collectively, "**Losses**"), arising out of or relating to any breach by the Indemnifying Party of its representations, warranties, or other obligations hereunder.

7.2 EXCEPT LIABILITY FOR BREACH OF CONFIDENTIALITY, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF COVERED INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS REPRESENTATIVES OR AFFILIATES BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE

5

DocuSign Envelope ID: A19926EE-8DF8-4A5E-840A-1AEB2C384443

OR ENHANCED DAMAGES, ARISING OUT OF, OR RELATING TO, OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT IT WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

8. **Relationship of the Parties**. Each Party is an independent contractor with regard to this Agreement. Nothing contained in this Agreement shall be construed as creating any agency, legal partnership, joint venture or other form of joint enterprise, employment, or fiduciary relationship between the Parties. Neither Party, by virtue of this Agreement, will have any right, power, or authority to act or create an obligation, express or implied, on behalf of the other Party. Any person employed or engaged by a Party shall be that Party's employees or contractors. Each Party assumes responsibility for the actions of its employees and contractors under this Agreement and will be solely responsible for their supervision, daily direction, and control, wage rates, withholding income taxes, providing unemployment and disability benefits, and the manner and means through which the work under this Agreement will be accomplished.

9. **Assignment and Delegation**. Neither Party shall assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other Party, which shall not be unreasonably withheld. Any purported assignment in violation of this 9 shall be null and void.

10. **General**. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, this Agreement may be modified to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by either Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. No amendment to this Agreement is effective unless it is in writing, identified as an amendment to this Agreement, and signed by each Party. Each Party shall deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement in writing and addressed to the other Party at the addresses set forth on the signature page of this Agreement (or to such other address that the receiving Party may designate from time to time in accordance with this section). Each Party shall deliver all notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), by email (with confirmation of transmission), or by certified or registered mail (in each applicable case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party and (b) if the Party giving the notice has complied with the requirements of this Section. This Agreement is the result of negotiations between and has been reviewed by each of the Parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the Parties hereto, and no ambiguity shall be construed in favor of or against any one of the Parties hereto. The words "include" or "including," and words of similar import and used herein shall not be deemed to be terms of limitation but rather shall be deemed to be followed in each case by the words "without limitation." The term "or" shall be deemed to mean "and/or". This Agreement and any other documents incorporated herein by reference and all related Schedules, constitutes the sole and entire agreement of the

Case 2:24-cv-00061    Document 1-5    Filed 08/26/24    Page 7 of 11 PageID #: 31

DocuSign Envelope ID: A19926EE-8DF8-4A5E-840A-1AEB2C384443

Parties with respect to the subject matter of this Agreement and therein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to the subject matter. This Agreement may be executed in counterparts, each of which is deemed an original, by all of which together are deemed to be one and the same agreement. A signed (including electronic signature, e.g., DocuSign) copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

**RICH FRONING FITNESS, LLC,**
a Tennessee limited liability company

By: *rory mckernan*
Name: rory mckernan
Title: Business Development Manager

**Address for Notice**:
Attn: Rory Mckernan
601 Rich Froning Way
Cookeville, TN 38501
Email: rory@mayhemnation.com;
cc: kevin@rockridgelaw.com

**FEAST BOX, LLC D/B/A JUST MEATS**
a Utah limited liability company

By: *Andrew Ettinger*
Name: Andrew Ettinger
Title: Chief Growth Officer

**Address for Notice**:

Email: andrew@justmeats.com

676 W 1200 N Springville, UT 84663

**Schedule 1.1**

**Deliverable and Compensation**

**Deliverables**

During the three-year period from the Effective Date, Mayhem through the Instagram accounts of @RichFroning and @MayhemAthlete (collectively "**Rich's Social Media**") shall provide the following Deliverables:

- Launch Deliverables. From February 1, 2024 up until February 28, 2024, the following social media Posts must be made ("**Launch Deliverables**"):

    o A minimum of two (2) static Posts or stories from Rich's Social Media related to, endorsing, or advertising Just Meats products. The Posts must include Froning's face/likeness with the either a meal prepared using Just Meats products or the Just Meats product itself.

    o A minimum of three (3) video Posts posted as reels and/or stories from @MayhemAthlete and @TheCrossFitMayhem accounts making a total of at least six (6) Posts. The Posts must include Froning's face/likeness with either a meal prepared using Just Meats products or the Just Meats product itself.

    o Up to two (2) Launch Deliverables from Rich's Social Media may be substituted by live content featuring Froning speaking on Just Meats products (e.g. a podcast episode).

- Social Media Story Highlights. A minimum of one (1) story highlight posted each week under the brand specific highlight section of either "Just Meats" or "Food" on @RichFroning Instagram profiles. For avoidance of doubt, this section does not apply to @MayhemAthlete.

- Froning Instagram Posts. Two (2) Instagram Posts per month by Froning on the @RichFroning Instagram account. Each of the two (2) Instagram Posts can be a story, reel, or photo, depending on Froning's preference that given month. Each Post must include the following:

    o A #JustMeats hashtag;

    o A specific hashtag for the style of meat featured in the Post (e.g. #brisket, #pulledpork, #carneasada);

    o The account tag @justmeats.co; and

    o Froning's face/likeness with either the meal prepared using Just Meats products or the Just Meats product itself.

**Compensation, Bonus, and Revenue Share.**

- Flat Licensing Payment. As consideration for entering into this Agreement, Just Meats shall pay to Mayhem (to an account set forth in a separate writing, including email) a flat monthly payment ("**Licensing Payment**") commencing on the Effective Date and repeating each month during the Term of this Agreement. Froning shall receive a flat monthly payment in the amount of thirteen thousand five hundred dollars ($13,500), which shall be payable in one lump sum payment each month.

- Revenue Share. Mayhem shall receive on a quarterly basis a ten percent (10%) commission ("**Revenue Share**") of gross sales of any customer purchasing Just Meats products through a Froning link or page. This Revenue Share is independent of any Licensing Payments to Mayhem. The Parties anticipate the development of a Froning Farms product that will comprise a percentage of product payment to Froning Farms, LLC, that is also independent of this Revenue Share. The Parties further anticipate a commission split of 5% to Mayhem and 10% to Mayhem

Affiliate gym owners for any purchases by customers of Mayhem Affiliate gym customers made through the respective Mayhem Affiliate gym placements, and/or any use of the Mayhem Affiliate customers lists for direct marketing by Just Meats, which in any case shall be subject to privacy law review.

## Provision of Just Meats

In performance of this Agreement, Just Meats shall provide to Mayhem the following:

- Marketing Collateral. During the Term, offers, codes, newsletter information, social promotion, etc. (collectively "**Marketing Collateral**") for Mayhem shall be provided by Just Meats to Just Meats customers. Specific offers and codes are to be determined by negotiation between the Parties.

- Weekly Video Call. One (1) weekly video call with Mayhem's designated account manager which lasts up to thirty (30) minutes. The weekly video call will review progress, what's successful, schedules, ideas, and insights from Just Meats media buyers and other internal marketing professionals. The overall purpose of the meetings will be to improve or continue success.

- Content Boosts. Subject to Mayhem granting access, Just Meats will boost content through paid ads on Instagram to expand the reach of Deliverables provided under this Agreement.

- Photo/Video Shoot. One (1) photo or video shoot scheduled at the end of each year, preferably the second week of December, to create content needed to carry out this Agreement. Location and exact dates of photo or video shoot are to be determined by the Parties.

- Just Meats Products. Just Meats will provide Mayhem with a sufficient number (enough for not less than 30 persons) of Just Meats product to be featured in the Deliverables and to otherwise acquaint Mayhem with the Just Meats products, as reasonably requested from time-to-time.

- Additional Content. If applicable, Mayhem will provide Just Meats with additional images, educational and digital content, as needed, to build out the influencer version of the home page and related content. Such additional content will be provided on condition that Just Meats produces commercials and other additional marketing material to push Just Meats consumers to the Mayhem landing page and Mayhem Just Meats codes.

- Additional Mayhem Athlete Endorsements. Just Meats will allow additional Mayhem Athletes to be incorporated into any promotional material after February 2024.

**FEAST BOX, LLC**

By: _Andrew Ettinger_
FD845F4031C045D...

Name: Andrew Ettinger

Date: 2/23/2024

**RICH FRONING FITNESS, LLC**

By: _rory mckernan_
6FECB778A8D84D4...

Name: rory mckernan

Date: 2/23/2024

10